IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Foundation for Eldercare,                         :
                                    Appellant     :
                                                  :
              v.                                  :    No. 982 C.D. 2017
                                                  :    Argued:  April 12, 2018
Dauphin County Board of Tax                       :
Assessment Appeals, Borough of                    :
Highspire and Steelton-Highspire                  :
School District                                   :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE DAN PELLEGRINI, Senior Judge


OPINION NOT REPORTED


MEMORANDUM OPINION BY
SENIOR JUDGE PELLEGRINI                          FILED: May 8, 2018


        The Foundation for Eldercare (Foundation) appeals from an order of

the Court of Common Pleas of Dauphin County (trial court) affirming the decision

of the Dauphin County Board of Tax Assessment Appeals (Board) finding that the

Foundation was not an institution of purely public charity and, therefore, not

entitled to an exemption from real estate taxes.  For the reasons that follow, we

affirm.


                                       **I.**

        The Pennsylvania Constitution provides that the General Assembly

may exempt from taxation "[i]nstitutions of purely public charity."  Pa. Const. art.

VIII, § 2(a)(v). Because our Constitution does not define that term, in *Hospital Utilization Project v. Commonwealth (HUP)*, 487 A.2d 1306 (Pa. 1985), our Supreme Court established a five-prong test to determine whether an institution qualifies as a purely public charity. Commonly referred to as the *HUP* test, an entity qualifies as a purely public charity under the Pennsylvania Constitution if it:

(a) Advances a charitable purpose;

(b) Donates or renders gratuitously a substantial portion of its services;

(c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;

(d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*Id.* at 1317. The burden is on the entity seeking the tax exemption to first show that it satisfies all five prongs of the *HUP* test. *Pocono Community Theater v. Monroe County Board of Assessment Appeals*, 142 A.3d 110, 115 (Pa. Cmwlth. 2016). By satisfying the *HUP* test, the applicant demonstrates that it meets the minimum constitutional qualifications for being an appropriate subject of a tax exemption. *City of Washington v. Board of Assessment Appeals of Washington County*, 666 A.2d 352 (Pa. Cmwlth. 1995), *aff'd*, 704 A.2d 120 (Pa. 1997). To qualify for a tax exemption, the entity must then also show that it meets the detailed statutory requirements of Section 5 of the Institutions of Purely Public Charity Act (Act 55), Act of November 26, 1997, P.L. 508, *as amended*, 10 P.S. §§ 371-385. If an entity does not satisfy the *HUP* test, there is no need to reach the Act 55 standards. *See Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Board of*

2

*Assessment Appeals*, 44 A.3d 3, 9 (Pa. 2012). Moreover, an organization does not qualify as a purely public charity merely because it is a non-profit corporation, and it is irrelevant whether the organization is recognized as a tax-exempt charity for federal income tax purposes. *Sacred Heart Healthcare System v. Commonwealth*, 673 A.2d 1021 (Pa. Cmwlth. 1996).

With this legal standard in mind, we now turn to the facts of the present case.

## II.

The Foundation is a Pennsylvania non-profit corporation which has been granted 501(c)(3)[1] tax-exempt status by the Internal Revenue Service (IRS) and currently operates 30 senior housing units throughout the Commonwealth. At issue here are five contiguous parcels of land in Highspire Borough, Dauphin County (properties) upon which homes have been constructed. The Foundation rents these properties to the disabled and senior citizens age 65 and over who are lower income, meaning persons with incomes less than 80% of the median household income in Dauphin County.[2]

The Foundation filed real estate tax assessment appeals with the Board for each of the properties seeking a real property tax exemption, stating the

---

[1] Section 501 (c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

[2] The median household income for Dauphin County is approximately $55,000; therefore, the maximum income level for eligible seniors to rent one of the properties from the Foundation is approximately $44,000.

properties were acquired as "rental dwelling[s] for qualified senior citizens in accord with the IRS approved by-laws of the Foundation." (Trial Court's Op. at 1.) The Board denied the Foundation's requests for tax-exempt status pursuant to the Supreme Court's decision in *HUP*. The Foundation appealed to the trial court, and the Borough of Highspire (Borough) and Steelton-Highspire School District (School District) intervened.

John Berg (Berg), Executive Director of the Foundation, testified before the trial court that the Foundation is recognized as an institution of purely public charity by the Pennsylvania Department of Revenue for state tax purposes and does not receive any government grants or loans. Berg is not paid a salary for his services, but the Foundation does have one part-time employee – Debra Begatto, Administrative Vice President, who handles recordkeeping and deals with the tenants and their issues for which she receives a salary of $800 per month plus travel expenses. The Foundation receives charitable gifts primarily from two sources – small private donations from members of the board and more substantial "gifts" from developers who are required to provide those gifts in consideration of receiving construction contracts from the Foundation.

The Foundation's 2014 IRS Form 990, Schedule J, offered into evidence at trial states that Berg received $11,485 in non-taxable benefits for the year and another Trustee received $500 in other reportable compensation. The Foundation's 2014 IRS Form 990, Schedule L, reveals that Berg also earned a brokerage fee of $102,000 that year.

4

The homes on each of the properties offer single-floor living with interior garages, hallways wide enough to accommodate walkers and wheelchairs, and space for a live-in caregiver so that seniors can "age in place." Berg testified that the Foundation rents these properties solely to seniors age 65 and older whose income is less than 80% of the median household income for Dauphin County, which the IRS deems to be "low-income." (Reproduced Record (R.R.) at 41a-43a.) Exceptions are made for extreme old age, meaning 80 and up, or those who are disabled, meaning they have received a state or county-issued disability tag.

Rent for the properties is set at $1,499 per month, which includes all maintenance services, lawn care, snow and ice removal, and interior and exterior repairs including the changing of filters and light bulbs. According to Berg, while this rental amount is sufficient to pay for current mortgage and operation expenses, it only represents 70% of the Foundation's costs of ownership and operation because it does not cover depreciation. Prospective tenants are not required to make a down payment, but they must submit one month's rent as a security deposit and pay the first month's rent up front. The Foundation does not take Medicaid payments and does not provide in-home services to tenants such as nursing or specialized care, community health screenings, counseling, meals or transportation. Berg testified that three of the five current tenants at the properties receive monthly subsidies between $100 and $300. These subsidies are provided solely within the discretion of the Foundation, can be canceled or terminated at any time for any reason or for no reason, and the written Rental/Subsidy Policies are not provided to prospective tenants upon filling out an application. He testified that this money for the subsidies comes from rents from other tenants. Berg further testified that the

5

Foundation's leases have senior sensitive provisions, including the ability to terminate the lease without penalty for physical reasons or death; the option to remain for the senior tenant's life; and limited rent increases tied to the rate of inflation so as to track benefit increases in Social Security.[3]

The Board then entered into evidence the entire transcript of Berg's deposition as taken on April 8, 2016. Berg testified that the purpose of the Foundation "is to provide safe, modern, affordable, and accessible housing for low middle-income senior citizens or persons who are disabled." (R.R. at 335a.) The Foundation advertises through print ads and Facebook and targets its advertising to persons of a certain age and income, meaning annual income of at least $35,000. Berg admitted that the Foundation does not target ads to or accept applications from very low-income individuals, as it is clear they cannot afford to pay the rent.

In response to the introduction of the deposition, Berg testified that as of the time of his deposition, there was no "rental policy" or standard set of criteria listed in the Foundation's rental application specifying the qualifications prospective tenants needed to meet, *e.g.*, their income level, age and disability. Instead, Berg conducts interviews with prospective tenants to determine these qualities and only after such determinations are made would they be provided with rental applications. The Foundation also runs credit reports and criminal

---

[3] Berg testified that the Foundation similarly applied for tax-exempt status for its properties located in other counties throughout the Commonwealth. As of the time of the hearing, the Foundation's application in Montgomery County was denied and an appeal was pending; the application in Chester County was granted; and the application in York County had not yet been ruled upon.

background checks on prospective tenants. Berg admitted that the Foundation could refuse to rent to applicants based upon ability to pay, family size or type of disability, as the Foundation is not equipped to deal with mentally-disabled tenants. Berg further testified that tenants would be permitted to renew their leases so long as they were physically able to maintain the residences, but they would not be allowed to remain or continue their leases if they could not afford to pay rent. In contrast to his hearing testimony, Berg admitted during his deposition that the rent charged by the Foundation covers the mortgage payments, maintenance and upkeep of the properties. Berg also testified that the monthly subsidies are currently capped at $500 per tenant and are dependent upon the Foundation's ability to afford such subsidies.

Gregory Bardell (Bardell), a licensed real estate broker, testified as an expert with respect to the fair market rental of the Foundation's properties. In October 2015, after reviewing comparables, bank appraisals and performing his own valuation of the properties, he testified that they were worth approximately $205,000 each. Given all of the data and factors he considered, including the services offered through the Foundation's leases, the upgrades to the homes, their location and the fact they were brand new, Bardell calculated a fair market rent of $2,050 per month for each of the properties.

Dr. Katherine E. Galluzzi (Dr. Galluzzi), professor and chairperson of the Department of Geriatric Medicine at the Philadelphia College of Osteopathic Medicine, testified as an expert on the relationship between senior well-being and housing issues. Dr. Galluzzi testified that she visited the properties and noted the

homes, including the kitchens and the bathrooms, were wheelchair accessible, there were no impediments to get a wheelchair from the garage into the home, the flooring was appropriate, and there were grab bars in the showers and near the toilets. In her opinion, individuals who know they are going to be able to age into their homes and who can anticipate being able to afford homes on a fixed income are able to engage more fully in the community and have a better sense of security, socialization and privacy. She further testified that enabling seniors to age into their own community and remain functional in that setting as long as possible forestalls the need for the government to expend Medicare and Medicaid dollars for placement.

Francis J. Lamb, a licensed CPA, testified that a replacement reserve was necessary so that the Foundation could replace items such as rooves, furniture and appliances, which wear out over time. After reviewing the Foundation's financial information, he determined that the rent collected for the properties was not sufficient to establish a replacement reserve, *i.e.,* depreciation, absent charitable gifts.

The trial court denied the requested tax exemptions. Citing to *In re: Appeal of Dunwoody Village (Dunwoody Village)*, 52 A.3d 408 (Pa. Cmwlth. 2012), it found that the Foundation failed to meet prongs three and four of the *HUP* test. The trial court noted that the Foundation only rents to middle-income seniors and the determination of whether to encourage a person to complete a rental application is based solely on an interview conducted by Berg. Moreover, the Foundation does not take Medicaid payments and its rental application does not

indicate the income or physical capability requirements it supposedly espouses for potential tenants. The trial court stated that this reflects screening individuals to assess their "rentability" and suggests that the Foundation is not open to all such situated persons.

In addition, the trial court noted that "the government does not by statute or otherwise have a burden to provide [housing] for middle-income seniors or mobility-disabled persons who can afford to make the rental payments which cover the costs of a mortgage and associated costs." (Trial Court's Op. at 3.) The trial court did not address the remaining prongs of the *HUP* test or the Act 55 standard. This appeal followed.[4]

### III.

### A.

The Foundation first argues that the trial court erred in concluding that it does not benefit a substantial and indefinite class of persons who are legitimate subjects of charity. The Foundation argues that low-income seniors are legitimate subjects of charity and the uncontroverted testimony establishes that it only charges $1,499 per month in rent, which represents 70% of its costs and significantly less than fair market rent for the properties, and that it provides subsidies to 60% of its tenants in Dauphin County. The Foundation notes that the trial court incorrectly refers to "middle-income" seniors when the record

---

[4] Our review in a real estate tax assessment appeal is limited to determining whether the trial court abused its discretion or committed an error of law, and whether the trial court's findings are supported by substantial evidence. *Pocono Community Theater*, 142 A.3d at 114 n.2.

establishes that it only rents to "low-income" seniors, as defined by the IRS. The Foundation further argues that the mere fact that it screens or assesses prospective tenants demonstrates an attempt to operate efficiently and does not, by itself, disqualify the Foundation from being considered a purely public charity. Moreover, the Foundation argues that the trial court's reliance upon *Dunwoody Village* is misplaced because the Foundation does not provide housing to wealthy seniors, does not charge a hefty entrance fee, and its monthly rental fees are significantly lower than those charged in *Dunwoody Village*.

The Foundation argues that our courts have recognized that senior citizens may be appropriate objects of charity due to financial need or the emotional, social and physical challenges which increase with age. *Grace Center Community Living Corp. v. County of Indiana*, 796 A.2d 1008 (Pa. Cmwlth. 2002); *see also Presbyterian Homes Tax Exemption Case*, 236 A.2d 776, 779 (Pa. 1968). However, the Foundation "cherry picks" certain facts from the record and ignores the other half of this prong of the *HUP* test – it must benefit a substantial and indefinite class of persons. As our Supreme Court has held, an essential feature of a public charity "is that it is not confined to privileged individuals, but is open to the indefinite public. It is this *indefinite* or unrestricted quality that gives it its public character." *Unionville-Chadds Ford School District v. Chester County Board of Assessment Appeals (Unionville)*, 714 A.2d 397, 401 (Pa. 1998).

As the trial court points out, Berg and the Foundation screen applicants and admittedly may turn down potential tenants due to inability to pay, the size of their family or the nature of their disability. Berg admitted during his

10

deposition that tenants are not permitted to remain if they are physically unable to maintain the property or are unable to pay. While there is testimony indicating that the Foundation charges less than the fair market rent for these properties, Berg also admitted during his deposition that the rent the Foundation does collect covers its mortgages and maintenance costs. Moreover, the Foundation admittedly targets its advertising to potential tenants with a minimum threshold income level, and the limited subsidies it provides can be canceled or terminated at any time, for any reason or no reason. Importantly, the Foundation does not accept Medicaid or government grants and subsidies, nor does it provide in-home services to its tenants to address any emotional, social or physical challenges they may encounter due to their age. As the trial court noted, these facts suggest that the Foundation screens individuals to assess their "rentability" – the probability that prospective tenants will be able to afford the rent and not do damage to the properties. All of these facts support the trial court's finding that the Foundation does not benefit a substantial and indefinite class of persons such as the elderly or all disabled individuals, but only those who can afford to make rental payments that cover the property's mortgage and associated costs.

**B.**

As for the fourth prong of the *HUP* test, the Foundation argues that the trial court erred in determining that it does not relieve the government of a portion of its burden because it is not carrying out an enumerated constitutional or statutory duty. The Foundation also argues that the trial court ignored Dr. Galluzzi's testimony that the Foundation serves low-income senior citizens and the disabled by providing them with unmet housing needs and that allowing seniors to

11

age-in-place avoids or delays admission into nursing homes and assisted-living facilities. The Foundation points to Dauphin County's Redevelopment Authority and a U.S. Government Accountability Office Report it submitted to the trial court as support for the proposition that providing housing for low-income senior citizens is a recognized governmental policy and function.

In *Unionville*, 714 A.2d at 401, our Supreme Court did hold that to meet the fourth prong of the *HUP* test, an entity does not have to show that the burden relieved is either constitutionally or statutorily imposed. However, that does not end our inquiry.

> The *HUP* test of whether an institution has relieved the government of some of its burden does not require a finding that the institution has fully funded the care of some people who would otherwise be fully funded by the government. The test is whether the institution bears a substantial burden that would otherwise fall to the government.

*Dunwoody Village*, 52 A.3d at 421 (quoting *St. Margaret Seneca Place v. Board of Property Assessment, Appeals and Review*, 640 A.2d 380, 385 (Pa. 1994)).

Here, the Foundation does not accept Medicaid or any other government payments or subsidies on behalf of its tenants. It also does not provide skilled nursing or specialized care to its tenants, or any other services such as health screenings, counseling, meals or transportation. The only services the Foundation provides are general maintenance functions frequently provided by landlords, (*i.e.,* lawn care, snow and ice removal, and interior and exterior repairs)

12

which would not otherwise fall upon the government. Importantly, there is no evidence of record that the tenants would otherwise require government housing assistance or be placed in nursing or assisted-living facilities but for the Foundation. Dr. Galluzzi's testimony regarding tendencies of the elderly, in general, is not enough to satisfy this burden.

Overall, this case is akin to *National Church Residences of Mercer County v. Mercer County Board of Assessment Appeals (Mercer)*, 925 A.2d 220 (Pa. Cmwlth. 2007), which involved a 40-unit apartment building that provided housing to low-income, elderly individuals. Just like the Foundation, Mercer did not provide its tenants with the benefit of any in-home services. Relying upon our Supreme Court's decision in *Metropolitan Pittsburgh Nonprofit Housing Corporation v. Board of Property Assessment, Appeals and Review*, 391 A.2d 1059 (Pa. 1978), we held that Mercer did not relieve the government of some of its burden by providing low-cost housing for the elderly with limited incomes. As such, here we discern no error or abuse of discretion in the trial court's determination that the Foundation failed to establish by credible evidence that it meets the fourth prong of the *HUP* test.

Accordingly, the order of the trial court is affirmed.

_____
DAN PELLEGRINI, Senior Judge

13

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Foundation for Eldercare, :  
                 Appellant :  
:  
:  
      v. : No. 982 C.D. 2017
:  
Dauphin County Board of Tax :  
Assessment Appeals, Borough of :  
Highspire and Steelton-Highspire :  
School District :  

**O R D E R**

AND NOW, this 8<u>th</u> day of <u>May</u>, 2018, the order of the Court of Common Pleas of Dauphin County in the above-captioned matter is hereby affirmed.

_____
DAN PELLEGRINI, Senior Judge